Our next case for argument is 24-1831, IronSource v. Digital Turbine. Mr. Ackerman, please proceed when you are ready. Good morning, Your Honors. May it please the Court, my name is Paul Ackerman, and I represent the appellant in this case, IronSource, in this appeal from the PTAB, challenging the Board's erroneous findings that the substitute claims presented by Digital Turbine during a post-grant review are both patent-eligible and patentable. The appeal presents three distinct and independent grounds why we believe the Board incorrectly determined that the substitute claims are entitled to issue. But the first question is standing. The first question is standing, Your Honor. I know you're standing there, but why does your client have standing to appeal here? You haven't been accused of infringement. We have not been accused of infringement, and this Court has made clear that in the procedural posture of a case coming from the PTAB, an actual allegation of infringement is not necessary. I think that this Court's decision in General Electric v. Raytheon Technologies is very informative of this case. It clearly points out that in that context, we accept the declared statements of injury in fact as true, and we also emphasize that under the relaxed standards of standing from Spokio, the real emphasis in this procedural context is whether there's an injury in fact to the person who's appealing. The London declaration that was submitted in our opening brief makes it. It appears to me that much of your case just stands on speculation, on things that could have happened. Show me something that's really concrete, a concrete injury. Yeah. The concrete injury, Your Honor, is that our client has a product that they have not only conceived, but they have developed a fully functional product that is now taken off the market because of the risk of infringement liability. Before they took it off the market, they colored the product a bit by removing features because of the patents in suit and offered contractual indemnity to customers, creating a more financial hardship. So the injury in fact is very clear. A product that took expensive time and energy to develop is not being sold or marketed because there is a threat in the marketplace of an infringement suit. But, okay, the last part seems critical, right? There has to be a threat in the marketplace of an infringement suit or at least a reasonable apprehension thereof somehow. And again, I would say that the reasonable apprehension is actually reflected more of the pre-General Electric type of framing of the issue. We do have a reasonable apprehension of suit here, even though the London Declaration has that coming through communications with our customer. Our customer was informed by Digital Turbine that their patents would prevent this product from being on the market. Not their patents, plural. Correct. But a particular patent whose claims were invalidated and gone. Correct. So how does that create a threat for a different patent? I mean, certainly you would agree with me that if I threatened your client about a patent or bicycle, and later on I acquire a different patent, a different set of claims that may have some meaningful differences between the claims I asserted against you or Ouellette threatened you with and those original claims were all validated, there has to be established connection because the thing that your customer was told related to a patent that was invalidated. So there's no question they can't be threatening you with that, right? Your client cannot possibly feel threatened to have to take things off the market now in light of the invalid patent, correct? Well, yes, but I respectfully disagree because of the procedural posture of the substitute claims that are before this panel. The 951 patent that was the source of the original threat is now invalid. The claims of the 256 patent that the board found to be invalid because of collateral estoppel were broader than the 951 patent. Almost the same, but they broadened a couple of claim limitations. No difference in the perceived threat from this broader claim. And now we have the substitute claims which have two minor changes in language and London Declaration. But here's the problem. You haven't demonstrated at all how the now substituted narrower claims would, how your client would feel under apprehension of suit. You haven't done anything to tease out those new claim limitations and explain how they may or may not read on the product your client seeks to be able to sell. And that's a problem for me. Your Honor, in the London Declaration in paragraphs 29 and 30, he does generally refer to the substitute claims as Where is the London Declaration? That's specific on the appendix 4389 to 4390, the paragraphs 29 and 30 that were said. And this Court has said that the party under threat of infringement need not concede infringement in order to establish standard. And again, the GE case So what is it he said on paragraph 29, I'm there right now, that specifically connected results for me between this completely different claim with two new narrowing limitations. And how did he say, for example, this new claim is insubstantially different, those two limitations don't affect the product. But what did he say that would do something to make me feel more comfortable that you're not in here trying to appeal a claim that you really aren't under any real perceived threat of infringing? In 29, Mr. London points out that the substitute claims in the 256 patent found to be patentable presented a direct and continuing impediment to Iron Source's plans to provide potential and existing customers with the oil product. And then they continue that those substitute claims, Iron Source continues to suffer injuries. And if we look at the nature of the claim amendments, it is a minor change in an eligibility check. And again, GE is informative. In the GE case, this Court found that the affidavit only obliquely referenced the specific limitations, but did still identify a current threat that was sufficient. And in fact, in the GE case, there was zero threat from lithium. Counsel, even if you were standing, why aren't you collaterally stopped? The patent office found you were collaterally stopped. On the one issue on collateral stopping that the Board discussed, that was on the 101 issue, Your Honor, Digital Turbine actually conceded that the way the Board addressed its decision, it could not be and did not raise collateral estoppel for the substitute claims that were in play because according to Digital Turbine, those claims are patently distinct from the claims that were addressed in the 951 decision. Even if they didn't concede that, Your Honor, the procedural posture on the 101 issue would make it so collateral estoppel should not attach against our position on 101 claims. In the 951 proceeding, all claims were invalidated on prior art. We had no basis to appeal the 101 decision. We would have had to wait for our reply brief. It was not an issue that could be cross-appealed. And when Iron Source voluntarily withdrew their appeal, they deprived us the opportunity to appeal the Board's decision. But again, even Digital Turbine has conceded that this is not an estoppel issue on 101. Now, going to the merits, our papers address them in great detail, and I'm not sure I can do justice to them in the six minutes that I have to argue. But if we look at the written description argument, there are two limitations. But I want to focus on what's called the query limitation of the papers. It is a revised motion to amend Digital Turbine edited language, querying an address repository for a network address of an installation file for said first software application and receiving the network address in response to the query. The plain language of this claim limitation has two specific requirements. One, you're going to make a query that is specifically for a network address of an installation file for the software application, and in response to that query, you're going to receive the network address. The formula of this limitation by Digital Turbine was very specific, and it was intended to address its perceived vision of white space in the prior art. They argued that PASHA does not disclose the installation client querying an address repository for a network address of an installation file, the exact plain language, for a software application. They further argued that even if they were to receive a query, the query would still not be for a network address. It would be for a download page. They found a specific patented way to the language for a network address of an installation file. The problem is that they found this in the silence of their own disclosure and silence is not possession of an invention. Counsel for D.T. was in possession of an argument to try to find patentability, but that is not possession of an invention. This is very factually analogous to the Moles case where plain language was added to a reflow solder process, and at the time in the art, a person of skill in the art might have divined that that would have been a way of attaching. But the silence in the disclosure was determinative. Just because something is obvious doesn't mean that there is possession of an invention. And here where you have an applicant adding specific plain limitations, arguing that they're not in the prior art, and those very same limitations, there's only silence on a broad, broad way that something could be accomplished. That's not possession of a specific plain limitation, but it's found in the remote, in the substitute claims. I would like to address the 101 issue. I'm skipping around on substantive issues. If there's questions, please ask. But substantively, the burden there in finding that these claims were indeed directed to patent-eligible subject matter. Starting with step one of Alice, we had argued that the claims are directed to an abstract concept of downloading in the background while maintaining the user experience in the foreground. The board expressly found that the claims are directed to downloading and installing an application in the background instead of directing the user to an app store, thereby maintaining user experience with the foreground application. Despite being somewhat critical of our framing of the abstract concept as being too general, they essentially adopted our language, but then went on to say that downloading in the background in this manner is not an abstract concept. We respectfully disagree with the board's findings. This is exactly a concept that was known for years. You download in the background while you can do something else in the foreground. There is nothing new in the computer arts about it. It was set forth in the record that Windows operating systems and others had done this for an eternity. And despite finding that the claims were not directed to an abstract concept, the board continued them. They arranged in step two. Counsel, you're making a decision not to save any time for rebuttal. If that's what you want to do, you should go for it. But it seems like a risky move. Yes, I will. Let me save my two minutes, Your Honor. Thank you. Mr. Gregorian, please proceed. Good morning, Your Honor. This is the court-type Gregorian for the FOA. So this case presents a classic request for advisory opinion. Our answer is a competitor in the field would like the court to advise it on the new substitute claims before it decides whether to engage in any activity that implicates them, whether that's restarting an old product, beginning a new product. They have shown no controversy. They've shown no contact between the parties concerning these claims or concerning the invalidated claims. For Digital Turbine's conduct, we have only a statement that is alleged to have been made from an unidentified person five years ago at Digital Turbine. So dropping a product isn't sufficient. If they had continued with it, there would have been a threat. But if they dropped the product, it's gone, and therefore they're not standing. Is that basically it? I wouldn't phrase it that way, because I think the key thing that is missing there is there is no connection in this record between their prior product and either the predecessor claims that were invalidated or the new substitute claims. And that is a hard and fast requirement in this Court's recent decisions in appeals from PGRs and IPRs, that there needs to be some showing of a concrete plan to engage in activity that risks infringement or infringement suit. And in Platinum Optics and in Insight and other decisions as well, the Court has said, like, that needs to be about the claims that this Court is going to adjudicate. Now, here we are missing that, because the only thing that Mr. London's declaration says about the predecessor product is that it is a sandboxed environment. There's four paragraphs in that, or four bullet points in that declaration, and it says, Click to install as it existed five years ago was an ability to avoid an app store where you click on the advertising link in app one and you will have a download from IronSource's sandbox servers. So there is not, even in that description, any admission that there's a background install going on. But put all of that aside, there's absolutely nothing in this declaration that talks about the eligibility check or the querying limitation, which are significant narrowing limitations that give these substitute claims a specific implementation. All that, let me circle back there, though, and say there is a further point that Your Honor hit on, which is they did swap the product. And the question for this Court now is, what is the dispute? And there is no dispute if the product has been stopped and there is no activity, nor a concrete plan for activity. And let me just put to the Court a hypothetical here, and that is what they could have done in that declaration. They had a free shot after the proceedings below to do whatever they wanted, not to say whatever they wanted, of course, but to do whatever they wanted. They could have convened a meeting at IronSource and approved a product plan and allocated an initial investment and told you all about that and told you that while not admitting infringement, there are aspects of that planned product that we have taken concrete steps towards that would implicate the claims in such a way that DigitalTurbine might, notwithstanding the fact we've never said anything to them before, assert infringement. They did none of that. All they did was say they have a desire, and that's the specific language from the declaration. They have a desire to introduce some sort of unspecified product in the future. And that is what makes this — I don't think that's a fair characterization at all.  They said they want to reintroduce the C2I functionality. That's what the declaration expressly says. We want to reintroduce the C2I functionality, and these new claims are preventing us from doing that. So I don't know. I mean, I feel like you've got a pretty good case, but this feels — your current statements feel like a pretty big overreach to me. So if I were going to — so let me take that paragraph in detail. There is no specific fact supporting that conclusion, right? And the reason is there's no actual plan for what they're going to release. We have five years — They had a product with the C2I functionality.  They say we would like to reincorporate it and relaunch it. That doesn't need a plan. That's like, I've got some old shoes in the closet, and I plan on wearing them tomorrow. You know, that's not really — I don't get this. Sure, Your Honor. And I would say that we are five years on in a rapidly moving technological environment. The fact that they wish to reintroduce some C2I functionality does not mean they are going to pull the code off the shelf and reimplement it exactly as it was five years ago. Or it might. The point is they haven't told you what they're going to do, and they haven't told you how it implicates the claims. You think they need to tell me from a technological — You don't think it's enough that they say, we want to reintroduce the C2I technology that we previously had on the product, but we can't because of this potential threat of infringement. I mean, you're fighting me on an issue that I don't think you can probably win on, but you can keep going on that issue. But I feel like you're sort of missing the boat because the bigger concern isn't the C2I functionality. It's the Declaration's failure to link it to the new claim limitations. So if you'd like to jump ship, because let me tell you, it's sinking. So if you want to jump ship, there's a life raft over here. I'm kind of floating it right out there for you. I understand, Rory, and that's where I was going, is that there's no connection. You'd agree with me if I swam in the wrong direction, my friend. Fair enough. I'm not abandoning that. That's not a specific plan where there were concrete steps that they'd prove it. It's a mere desire to reintroduce something. But there is no connection to the claims that this Court was asked to adjudicate, and that's the failure, and that's the failure. Why don't you address paragraph 29 of the London Declaration, which is what they brought us? Sure. It says at most that the fact that the substitute claims have been deemed patentable prevents us from reintroducing the C2I features despite a desire to do so. There's no fact on which the Court can say, yes, the substitute claims do impose some sort of a blockage or dispute about whether C2I meets the new limitations. That was available to them to say if it was part of their product and part of their plan, and they did not. And that is the key point that led to the Court's decisions in Platinum Optics and Insight. The rulings in those cases say you need to explain how the concrete plan actually implicates the claims in a way that makes this an actual controversy. Again, here, they have a desire to do something. And conceding Judge Moore's point that there's something on the shelf that's five years old that maybe they could do, we don't know whether that has eligibility check. We don't know whether that has a declaring limitation. We don't even know if that's a background install product because those facts are not correct. Yes, it does directly link the 256 patent. And it says that the substitute claims of the 256 patent have been deemed patentable by the Pete. Prevent Island Source from reintroducing the C2I features despite a desire to do so. Customers will continue to have the same view as they had of the other patents. I grant you that he says that. My point is only the Court has required more, which is you need to explain how. There needs to be some factual basis on which the Court can agree that there is an impediment to that product, that actual product with a specific plan that implicates the claims at issue. Otherwise, there's no controversy. The fact that he offers that conclusion does not give the Court any basis to scrutinize here, whether it has actual jurisdiction or not. It's a statement in the air. Ultimately, thank goodness for life rafts. Indeed, indeed. But, I mean, that is the most obvious point that can be made here, right? It is shot through all of the glitches and decisions in standing from PGR and IPR appeals, that there has to be something tying to the claims and there is not yet. I'll turn to the substantive issues if the Court would like to hear on those, and I'll address them as my colleague did. So with respect to the clearing limitation, again, for all these issues, we're on a substantial evidence standard. Most of the questions are whether the Board had substantial evidence to find the facts that it did. With respect to the clearing limitation, the Board said this is a near verbatim copying of the specification into the claim, which it is. The support in the specification says that the installation client obtains address information, e.g., a link to the installation file by one of, and one of the examples is querying an address repository, e.g., on an external server over the network and receiving the address information in response to the query. Now, the argument on appeal is simply that a skilled artisan would not understand what the query was, specifically knowing that you're querying an address repository and you are receiving that address information, the skilled artisan would not know that that query is for the address information in the database, that there is not a gap there. And even if there were a gap, there is testimony in the record from Dr. Mao that a skilled artisan would understand what the query was for, and that's at Appendix 3940 and 41 in the context of this claim construction argument, where he's saying the address repository itself would be understood as network-connected storage that provides a network address of an installation file in response to the query for a network address of such an installation file. Why don't you address eligibility? Happily. That's such an issue he's going to address. Yes, understood, Your Honor. And with respect to 101, I think, again, here, the easy way to resolve this case is at Step 2, based on the factual determinations made by the Board. There is we think these claims are dead on for the DDR case in that they are not directed towards installation abstractly or background installation abstractly, but these new substitute claims have a specific implementation, and that's using an installation client pre-installed on the device that performs an eligibility check of the installed application before installing a new application and querying the address repository to find the application data that you wish to install. But even if this Court disagrees, there's at least a question about whether those limitations are conventional because the specification does not say that the eligibility check is conventional because it isn't. A token-based eligibility check to check the eligibility of the application already installed on the device was new and unconventional. And thus the Board was entitled to... Isn't all that written in by software? Well, Your Honor, these are all software functions. That's correct, and we're describing an architecture of software that has different types of functions, but that's where the specificity comes in. There are many ways you could have a background install, but this claim is a particular way that you do a background install where the installation client is invoked in a certain way and performs this check and queries an address. And I would say, finally, with respect to 101, they didn't... So I don't think they even raised a factual issue. If you look at the citations in reply at 27, they put a bulk cited to their expert's testimony about all sorts of subjects in the PGR. But if you bear down on those to the Step 2 testimony, they have a bare conclusion that an eligibility check is conventional. It's just an unsupported statement by their expert with no supporting facts offered. They have also cited Appendix 2579 through 80, which is testimony about disclosure by PASHA. Now, we, of course, submit that there was no disclosure by PASHA because PASHA dispenses user permissions for the application you're installing. But even if there was, under this court's precedent, mere disclosure by a single reference is not proof of conventionality. Conventionality requires more than mere disclosure. It requires that the technology actually be known and conventional out in the world through multiple systems or references. With that, thank you very much. So I would like to address counsel's continued reliance on the platinum optics case with respect to standing and respectfully suggest that the better case that this court should be looking at is the GE versus Raytheon case. In platinum optics, there was a dismissal of a patent with prejudice. That patent could not be sued again. The future products were completely conceptualized. They did not put a product on the back shelf. And in the GE case, we have a specific allegation that the substitute claims are causing the injury. In fact, that is more than sufficient under GE. And, in fact, in the GE case, there was absolutely no threat from Raytheon in the record. It was GE's perception that caused them to have an injury, in fact. On the 101 issue, the board, like I started talking about, had made an error in finding that there was no abstract concept. And then in trying to say in abstract that there was an inventive step or in part two that there was something that saved it, they said that the claim invention invokes the installation client to install the app in the background without interrupting the user interaction in the foreground. That's on appendix 56. They're basically restating the abstract concept as the inventive idea. And with respect to the changing of the ordering that the board also relied on, kind of looking at BASCM, the order that they cite, which is invoking the installation client and using that if it's available, otherwise going to the app store, that is clearly disclosed in PASHA. It was an anticipatory reference that clearly has those. And then when we look at the new limitations in the substitute claims, the eligibility check was explained by Dr. Adleroff as being conventional, the use of tokens conventional. What's your best argument that ties the London Declaration to the substitute claims? Sure. Paragraphs 24, 29, and 30 expressly reference the substitute claims as a whole, even though we don't address the specific limitations. And GE does not require a limitation by limitation explanation, and oblique references to the claims are sufficient. Thank you, Your Honors. Thank you. I thank both counsel. The case is taken under submission.